**STEVEN F. HUBACHEK**
California Bar No. 147703
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Steven_Hubachek@fd.org

Attorneys for Mr. Orozco-Aguirre

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE LARRY A. BURNS)**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>VICTOR MANUEL OROZCO-AGUIRRE,<br><br>Defendant. | Case No. 08CR0644-LAB<br><br>Date: April 14, 2008<br>Time: 2:00 p.m.<br><br>STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTIONS |

I.

**STATEMENT OF FACTS**

On February 22, 2008, Mr. Orozco Aguirre drove a blue Freightliner tractor trailer to the Highway 86 checkpoint at 11:30 p.m. Border Patrol Agent Timothy Delgado was using a narcotics detector dog to examine vehicles in the primary inspection area. His dog purportedly alerted to the rear of the tractor trailer. Delgado informed the primary inspector, Border Patrol Agent Carney, of the dog's alert. Carney claims to have sought and received Mr. Orozco Aguirre's consent to search the "entire vehicle and trailer." *See* Report of Border Patrol Agents Delgado and Carney, attached hereto as Ex. A, at 2-3. Mr. Orozco Aguirre was then sent to secondary inspection.

In secondary inspection, Agent Delgado again examined the vehicle with his dog, which purportedly alerted to the rear of the trailer a second time. *See id.* at 2. Border Patrol Agent Maldonado was then directed to interrogate Mr. Orozco Aguirre. *See id.* Maldonado questioned Mr. Orozco Aguirre regarding

his cargo, and he responded that he was carrying empty beer bottles. *See id.* According to Delgado, during Maldonado's questioning, Mr. Orozco Aguirre removed a seal on the trailer's door, "[w]ithout being prompted." *See id.* That assertion is inconsistent with Carney's claim that he secured consent to search the "*entire* vehicle and trailer." *See id.* at 2-3 (emphasis added). At any rate, opening the rear door revealed two large duffel bags. Mr. Orozco Aguirre stated that he did not know how they got there. The duffel bags contained marijuana.

Delgado and his dog (Rambo-C) "are a certified United States Border Patrol Detection team." *See id.* at 2.[1] They "are certified in the detection of concealed humans and the odors of narcotics and their derivatives." *See id.* Although the government has not produced any discovery regarding the certification or Rambo-C's abilities, Delgado does not claim that his dog is capable of indicating, by way of some sort of an alert, that a person was concealed in the trailer. Rather, Delgado claims Rambo-C can detect "narcotics and their derivatives" by odor. *See id.*

DEA Special Agents Jeff Butler and Joanne Camacho interrogated Mr. Orosco Aguirre at approximately 3:40 a.m. Agent Camacho read a *Miranda* warning from a DEA form, a DEA 13a. The government has not produced the form 13a, nor has it provided any electronic or other record of the interrogation other than a report prepared by Agent Camacho. Mr. Orozco Aguirre supposedly agreed to answer questions. He made incriminating statements, although he did deny knowledge of the marijuana in the trailer.

## II.

## MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE

Mr. Orozco Aguirre moves for the production of the following discovery. This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies." *See United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989).

(1) The Defendant's Statements. The government must disclose to the defendant all copies of any written or recorded statements made by the defendant; the substance of any statements made by the

[1] Delgado refers to the dog as either Rambo-C or, simply, Rambo. The defense will use Rambo-C.

defendant which the government intends to offer in evidence at trial; any response by the defendant to interrogation; the substance of any oral statements which the government intends to introduce at trial and any written summaries of the defendant's oral statements contained in the handwritten notes of the government agent; any response to any *Miranda* warnings which may have been given to the defendant; as well as any other statements by the defendant. Fed. R. Crim. P. 16(a)(1)(A).

(2) Arrest Reports, Notes and Dispatch Tapes. The defendant also specifically requests the government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate to the circumstances surrounding his arrest or any questioning. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained. Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and *Brady v. Maryland*, 373 U.S. 83 (1963). The government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch and other tapes, sworn statements, and prosecution reports pertaining to the defendant and his arrest. See Fed. R. Crim. P. 16(a)(1)(B) and (C), Fed. R. Crim. P. 26.2 and 12(I).

(3) Brady Material. The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case. Under *Brady*, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. *United States v. Bagley*, 473 U.S. 667 (1985).

(4) Any Information That May Result in a Lower Sentence Under The Guidelines. The government must produce this information under *Brady*, 373 U.S. 83. This request includes any cooperation or attempted cooperation by the defendant as well as any information that could affect any base offense level or specific offense characteristic under Chapter Two of the Guidelines. The defendant also requests any information relevant to a Chapter Three adjustment, a determination of the defendant's criminal history, and information relevant to any other application of the Guidelines.

(5) The Defendant's Prior Record. The defendant requests disclosure of his prior record. Fed. R. Crim. P. 16(a)(1)(B).

(6) Any Proposed 404(b) Evidence. The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1)(C) and Fed. R. Evid. 404(b) and 609. In addition, under Rule 404(b), "upon

request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government proposes to introduce under Rule 404(b) at trial. The defendant requests such notice at least two weeks before trial.

(7) Evidence Seized. The defendant requests production of evidence seized as a result of any search, either warrantless or with a warrant. Fed. R. Crim. P. 16(a)(1)(C).

(8) Request for Preservation of Evidence. The defendant specifically requests the preservation of all dispatch or other tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to the arrest in this case. This request includes, but is not limited to, the marijuana plants and any samples of narcotics used to run any scientific tests, any narcotics, the results of any fingerprint analysis, the defendant's personal effects, and any evidence seized from the defendant or any third party.

Mr. Orozco Aguirre requests that the Assistant U. S. Attorney assigned to this case oversee a review of all personnel files of each agent involved in the present case for impeachment material. *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991). *But see United States v. Herring*, 83 F.3d 1120 (9th Cir. 1996).

(9) Tangible Objects. The defendant requests the opportunity to inspect and copy as well as test, if necessary, all other documents and tangible objects, including photographs, books, papers, documents, alleged narcotics, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to the defendant. Fed. R. Crim. P. 16(a)(1)(C). The defendant requests a copy of the form containing the *Miranda* warnings allegedly read to him, and any other warnings provided to him. He also requests training records, training manuals, written certification standards, and score sheets from any facility that trained Rambo-C or the Agent Delgado/Rambo-C team to detect drugs or persons; all detection training records for Rambo-C or the Agent Delgado/Rambo-C team; current written performance standards for the dog and score sheets of all re-certification evaluations; departmental training evaluation for the dog handler and the dog handler's supervisor(s); all records of the dog's performance in real world searches since initial certification; police reports, warrants, and laboratory reports relating to Rambo-C; and reports and records regarding Rambo-C's performance in this case.

//

(10) Expert Witnesses. The defendant requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness during its case in chief. Fed. R. Crim. P. 16(a)(1)(E).

(11) Evidence of Bias or Motive to Lie. The defendant requests any evidence that any prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or her testimony.

(12) Impeachment Evidence. The defendant requests any evidence that any prospective government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to the defendant. See Fed. R. Evid. 608, 609 and 613; *Brady v. Maryland*.

(13) Evidence of Criminal Investigation of Any Government Witness. The defendant requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.

(14) Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling. The defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic.

(15) Witness Addresses. The defendant requests the name and last known address of each prospective government witness. The defendant also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a government witness.

(16) Name of Witnesses Favorable to the Defendant. The defendant requests the name of any witness who made an arguably favorable statement concerning the defendant or who could not identify him or who was unsure of his identity, or participation in the crime charged.

(17) Statements Relevant to the Defense. The defendant requests disclosure of any statement relevant to any possible defense or contention that he might assert.

(18) Jencks Act Material. The defendant requests production in advance of trial of all material, including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500.

Advance production will avoid the possibility of delay at the request of defendant to investigate the Jencks material. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1). *Campbell v. United States*, 373 U.S. 487, 490-92 (1963). *United States v. Boshell*, 952 F.2d 1101 (9th Cir. 1991), holds that when an agent goes over interview notes with the subject of the interview the notes are then subject to the Jencks Act.

(19) Giglio Information. Pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), the defendant requests all statements and/or promises, express or implied, made to any government witnesses, in exchange for their testimony in this case, and all other information which could arguably be used for the impeachment of any government witnesses.

(20) Informants and Cooperating Witnesses. The defendant requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Orozco Aguirre and/or in the investigation that resulted in the instant charges. The government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense. *Roviaro v. United States*, 353 U.S. 52, 61-62 (1957). The government must disclose any information derived from informants which exculpates or tends to exculpate the defendant.

(21) Bias by Informants or Cooperating Witnesses. The defendant requests disclosure of any information indicating bias on the part of any informant or cooperating witness. *Giglio*, 405 U.S. 150.

(22) Residual Request. Mr. Orozco Aguirre intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. Mr. Orozco Aguirre requests that the government provide him and his attorney with the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

//

//

//

**II.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE INSTRUCTIONS GIVEN TO THE GRAND JURY FORBID THAT BODY FROM FULFILLING ITS TRADITIONAL ROLE.**

The indictment in the instant case was returned by the January 2007 grand jury. *See Reporter's Partial Transcript of the Proceedings* (hereafter "Instructions"), dated January 11, 2007.[2] The instructions deviate, in several ways, from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district.[3]

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, *see Instructions* at 3, 3-4, 5, this Court instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." *See id.* at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" *See id.* at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, this Court referred to an instance in the grand juror selection process in which it excused three potential jurors. *See id.* at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

*Id.* That "principle" was this Court's discussion of the grand jurors' inability to give effect to their disagreement with Congress. *See id.* at 8-9. Thus, this Court not only instructed the grand jurors on its view of their discretion; it enforced that view on pain of being excused from service as a grand juror.

---

[2] Because this motion has been filed several times, counsel is not attaching the (lengthy) transcripts cited herein.

[3] *See, e.g.*, *United States v. Cortez-Rivera*, 454 F.3d 1038 (9th Cir. 2006); *United States v. Navarro-Vargas*, 408 F.3d 1184 (9th Cir.) (en banc), *cert. denied*, 126 S. Ct. 736 (2005) (*Navarro-Vargas II*); *United States v. Navarro-Vargas*, 367 F.3d 896 (9th Cir. 2004)(*Navarro-Vargas I*); *United States v. Marcucci*, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

In addition to its instructions on the authority to choose not to indict, this Court also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. *See id.* at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

*Id.* (emphasis added). This Court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." *See id.* at 27.

Mr. Orozco Aguirre was indicted by the January 2007 grand jury on March 5, 2008.

**A. *Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. *See Navarro-Vargas II*, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[4] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. This Court's instructions cannot be reconciled with the role of the grand jury as set forth in *Navarro-Vargas II*.

For instance, with respect to the grand jury's relationship with the prosecution, the *Navarro-Vargas II* majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" *Navarro-Vargas II*, 408 F.3d at 1200 (quoting *Butz v. Economou*, 438 U.S. 478, 510 (1978)). *Accord Navarro-Vargas I*, 367 F.3d at 900 (Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ). *See also Navarro-Vargas II*, 408

---

[4] *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, *id.*, but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." *Id.* *See* Niki Kuckes, *The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury*, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., *Criminal Procedure* § 15.2(g) (2d ed. 1999)).

Indeed, the *Navarro-Vargas II* majority agrees that the grand jury possesses all the attributes set forth in *Vasquez v. Hillery*, 474 U.S. 254 (1986). *See id.*

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

*Id.* (quoting *Vasquez*, 474 U.S. at 263). The Supreme Court has itself reaffirmed *Vasquez*'s description of the grand jury's attributes in *Campbell v. Louisiana*, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime." *Id.* at 399 (citing *Vasquez*, 474 U.S. at 263).

Judge Hawkins notes that the *Navarro-Vargas II* majority accepts the major premise of *Vasquez*: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime." *See id.* at 1214 (Hawkins, J. dissenting). *Accord Navarro-Vargas I*, 367 F.3d at 899 (Kozinski, J., dissenting); *Marcucci*, 299 F.3d at 1166-73 (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit. But not in the instructions.

**B. <u>The Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.</u>**

The *Navarro-Vargas II* majority found that the instruction in that case "leave[s] room for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision in *Marcucci*. *Marcucci* reasoned that the instructions do not mandate that grand jurors indict upon

every finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out. *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). *See also id.* ("The 'word' should is used to express a duty [or] obligation.") (quoting *The Oxford American Diction and Language Guide* 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." *See Instructions* at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." *Vasquez*, 474 U.S. at 264.

Nor does the *Navarro-Vargas II* majority's faith in the structure of the grand jury a cure for the instructions excesses. The *Navarro-Vargas II* majority attributes "[t]he grand jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent." *Id.* at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power." *See id.* at 1214 (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." *Id.* After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" *Id.* (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)). If that

"invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in *Vasquez*. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them." *Id.*

In setting forth Judge Hawkins' views, Mr. Orozco Aguirre understands that this Court may not adopt them solely because the reasoning that supports them is so much more persuasive than the majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in *Vasquez*, *Campbell*, and both *Navarro-Vargas II* opinions. *Navarro-Vargas II* is distinguishable on that basis, but not only that.

This Court's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause, emphasize this mistaken view of grand jury discretion. Because of the redactions of the grand jurors' names, Mr. Orozco Aguirre will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. *See Voir Dire Transcript* at 16. The CSW was also troubled by certain unspecified immigration cases. *See id.*

This Court did not determine what sorts of drug and immigration cases troubled the CSW. It never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, he provided instructions suggesting that, in any event, any scruples LCW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

*See id.* at 16-17 (emphasis added). Thus, without any sort of context whatsoever, this Court let the grand juror know that he would not want him or her to decline to indict in an individual case where the grand juror

"[didn't] like what our government is doing," *see id.* at 17, but in which there was probable cause. *See id.* Such a case "should go forward." *See id.* Given that blanket proscription on grand juror discretion, made manifest by this Court's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." *See id.* Again, this Court's question provided no context; it inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror listening to this exchange could only conclude that there was *no* case in which this Court would permit them to vote "no bill" in the face of a showing probable cause.

That same point was emphasized in this Court's exchange with REA. REA first advised the Court of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." *See id.* at 24. This Court first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. ...

*Id.* at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, this Court went on to suggest that REA recuse him or herself from medical marijuana cases. *See id.* at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." *See id.* That disclosure prompted this Court to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."
>
> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

*Id.* at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, this Court reinforced the "obligation" to indict in every case in which there was probable cause.

> The Court: do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers. I'll excuse you at this time.

*Id.* at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," *see id.*, as it should. Because REA's vote "depend[s] on the case," *see id.*, it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, this Court did not explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward." *See id.* at 27. That is why even the "chance," *see id.*, that a grand juror might not vote to indict was too great a risk to run.

The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer serving, apparently because they expressed their willingness to act as the conscience of the community. *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under *Vasquez* "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting *Gaither v. United States*, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess only “very limited” power “to fashion, on their own initiative, rules of grand jury procedure,” *United States v. Williams*, 504 U.S. 36, 50 (1992), and, here, this Court has both fashioned his own rules and enforced them. The instructions here are therefore structural error. *See Navarro-Vargas II*, 408 at 1216-17 (Hawkins, J., dissenting). The indictment must be dismissed.

Nor can the word games played by the *Navarro-Vargas II* and *Marcucci* save the instructions: *in their entirety*, the instructions here prohibited the grand jury from exercising the discretion established in both *Vasquez* and *Navarro-Vargas II*, specifically the discretion to not indict even if the grand jury finds

probable cause. *See Vasquez*, 474 U.S. at 264; *Navarro-Vargas II*, 408 F.3d at 1200. As noted above, because the model charge "does not state that the jury 'must' or 'shall' indict, but merely that it 'should' indict if it finds probable cause," *Navarro-Vargas II* held that the model instruction did not violate the grand jury's independence. *See* 408 F.3d at 1205. Resort to that unlikely reading of the word "should" is to no avail here.

It is true that on several occasions, this Court used the word "should" instead of "shall" with respect to whether an indictment was required if probable cause existed. In context, however, it is clear that he could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, this Court not only told the jurors that they "should" indict if there is probable cause, it told them that if there is not probable cause, "then the grand jury should hesitate and not indict." *See Voir Dire* at 8. At least in context, it would strain credulity to suggest that this Court was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." *See Navarro-Vargas II*, 408 F.3d at 1205.

The full passage cited above effectively eliminates any possibility that this Court intended the *Navarro-Vargas II* spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

*See Voir Dire* at 8. Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict. This Court could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." *See Navarro-Vargas II*, 408 F.3d at 1205 (citing *Marcucci*, 299 F.3d at 1159). That would contravene the grand jury's historic role of protecting the innocent. *See, e.g., United States v. Calandra*, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if this Court said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," *see Navarro-Vargas II*, 408 F.3d at 1205 (citing *Marcucci*, 299 F.3d at 1159), then it would have to have intended two

different meanings of the word "should" in the space of two consecutive sentences. That could not have been this Court's intent. But even if it were, no grand jury could ever have had that understanding. Jurors are not presumed to be capable of sorting through internally contradictory instructions. *See generally United States v. Lewis*, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted). Finally, even if a juror could somehow latch onto some tenuous claim of ambiguity in the word "should," the Court eliminated any sort of permissive construction by advising the grand jurors of the "obligation" to indict if there is probable cause. *See Voir Dire* at 26-27.

**C. <u>The Instructions Conflict With *Williams*' Holding that there Is No Duty to Present Exculpatory Evidence to the Grand Jury.</u>**

In *Williams*, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law. *See* 504 U.S. at 45, 51. *Williams* held that "as a general matter at least, no such 'supervisory' judicial authority exists." *See id.* at 47. Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" *id.* at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." *Id.* at 47 (emphasis added). The federal courts possess only “very limited” power “to fashion, on their own initiative, rules of grand jury procedure.” *Id.* at 50. As a consequence, *Williams* rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law. *See id.* at 51-55.

Despite the holding in *Williams*, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. *See Instructions* at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

*Id.* (emphasis added). Moreover, this Court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." *See id.* at 27.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that *Navarro-Vargas II* somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." *See id.* at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations. The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." *See id.* Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." *See id.* at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

> (1) I have to consider evidence that undercuts probable cause.
> (2) The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.
> (3) Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions therefore discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

**D. The Absolute Prohibition on Consideration of Penalty Information Violates *Vasquez*.**

The instructions advise the grand jurors that they are forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court: In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court: Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.* We want you to make a business-like decision of whether there was a probable cause. ...

*See Voir Dire* at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in *Marcucci*. *See Cortez-Rivera*, 454 F.3d at 1040-41. *Cortez-Rivera* is inapposite for two reasons. First, this Court did not use the term "should" in the passage quoted above. Second, that context, as well as this Court's consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by *Cortez-Rivera*. The instructions again violate *Vasquez*, which plainly authorized consideration of penalty information. *See* 474 U.S. at 263.

**E. The Errors Are Structural.**

The errors here are constitutional: Mr. Orozco Aguirre is entitled to the "traditional functioning of the institution that the Fifth Amendment demands," *see Williams*, 504 U.S. at 51, and the instructions do not permit the grand jury to perform its function as is demonstrated by the instructions' many conflicts with *Vasquez*. That error is structural. *See Navarros-Vargas*, 408 F.3d at 1214, 1216-17 (Hawkins, J., dissenting). *Accord Navarros-Vargas*, 367 F.3d at 903 (Kozinski, J., dissenting).[5] Nevertheless, even were

---

[5] Because the *Navarro-Vargas II* majority found no error in the form instruction given, and not modified, in that case, the majority had no occasion to address the structural error analyses in Judge Hawkins' and Judge Kozinski's dissents. This Court may therefore rely upon them as the persuasive authority of six Ninth Circuit judges.

this Court restricted to exercising its supervisory powers, the decision to excuse at least two grand jurors created the necessary prejudice to warrant dismissal.

## IV.

## THIS COURT SHOULD ORDER PRODUCTION OF THE GRAND JURY TRANSCRIPTS

### A. Introduction

Judge Moskowitz has ruled on a motion similar to that filed by Mr. Orozco Aguirre. *See United States v. Martinez-Covarrubias*, Case No. 07cr0491-BTM, Order Denying Defendant's Motion to Dismiss the Indictment, dated October 11, 2007 (hereinafter "Order").[6] While Mr. Orozco Aguirre disagrees with Judge Moskowitz's analysis, Judge Moskowitz at least recognizes that the instruction cited above is error, although he incorrectly found that it was not structural. *See Order* at 11. Because, under Judge Moskowitz's analysis, this Court must determine whether the error was harmless, Mr. Orozco Aguirre files the instant motion to produce the transcripts of the grand jury proceedings that resulted in the instant indictment.

### B. The Court Should Order Disclosure of All Grand Jury Transcripts Because Mr. Orozco Aguirre's Exculpatory Statements Are Facts That Cut Against the Government's Request That the Grand Jury Indict Him.

The Court may order disclosure of grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). The Ninth Circuit requires a "particularized need" to justify disclosure, *see United States v. Walczak*, 785 F.2d 852, 857 (9th Cir. 1986), but that need cannot be any different than the standard set forth in Rule 6(e)(3)(E)(ii): Mr. Orozco Aguirre need only show that "a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added). That is why the Rule's "general suggestion [is] in favor of disclosure." *See Walczak*, 785 F.2d at 857. Here, under Judge Moskowtiz's approach to this Court's instruction, it is clear that, at the very least, "a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added).

Again, this Court instructed the grand jury that "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence."

---

[6] A copy of the Order is attached hereto as Ex. B.

*Instruction* at 20. According to Judge Moskowitz, "if Defendant can establish that the Government in fact knew of exculpatory evidence that was not presented to the grand jury and that this failure to present exculpatory evidence, in conjunction with Judge Burns' comments, 'substantially influenced the grand jury's decision to indict' or raises 'grave doubt' that the decision to indict was free of the substantial influence of such events, the Court may dismiss the indictment under its supervisory powers." *See Order* at 11-12. Because he assigned that burden to defendant Martinez-Covarrubias, he granted Mr. Martinez-Covarrubias "leave to conduct discovery regarding what evidence was presented to the grand jury." *See id.* at 12. This Court should do the same here.

Indeed, there is even more reason to do so here. The *Martinez-Covarrubias* Order cites no exculpatory information. But here, the government well knew that Mr. Orozco Aguirre denied liability for the offense upon which the government sought indictment.

Similarly, the facts that Mr. Orozco Aguirre denied knowledge and lacked any record are just the sorts of facts that a grand jury would be likely to consider in deciding whether to exercise its power not to indict.

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

*Vasquez*, 474 U.S. at 263 (citation omitted). Thus, there are at least two theories under which this evidence "cuts against" the government's request for an indictment as to Mr. Orozco Aguirre.

Because the "particularized need" standard, *see Walczak*, 785 F.2d at 857, requires no more than a showing "a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury," Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added), and because the Rule's "general suggestion [is] in favor of disclosure," *see Walczak*, 785 F.2d at 857, this Court should order disclosure in order to permit Mr. Orozco Aguirre to meet his burden under Judge Moskowitz's approach. *See Order* at 12.

//

//

//

**V.**

## THIS COURT SHOULD SUPPRESS ANY STATEMENTS MADE BY MR. OROZCO AGUIRRE UNLESS THE GOVERNMENT MEETS ITS BURDEN TO PROVE A KNOWING AND INTELLIGENT WAIVER.

### A. The Government Must Demonstrate Compliance With *Miranda*.

#### 1. *Miranda* Warnings Must Precede Custodial Interrogation.

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).[7] The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda*, 384 U.S. at 444. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id. See Orozco v. Texas*, 394 U.S. 324, 327 (1969).

The warnings must advise the defendant of each of his "critical" rights. *United States v. Bland*, 908 F.2d 471, 474 (9th Cir. 1990). "In order for the warning to be valid, the combination or the wording of its warnings cannot be affirmatively misleading." *United States v. San Juan-Cruz*, 314 F.3d 384, 387 (9th Cir. 2003) (citing *United States v. Connell*, 869 F.2d 1349, 1352 (9th Cir. 1989)). "The warning must be clear and not susceptible to equivocation." *Id. See also id.* at 389-90 (vacating illegal entry conviction where defendant was advised of his administrative rights from an I-826 form and later advised of his *Miranda* rights).

Here, Mr. Orozco Aguirre was interrogated twice. The first interrogation was undertaken by Agent Maldonado, who interrogated him after Agent Carney supposedly secured consent to search the entire tractor trailer, after Carney terminated his immigration inspection, and after the two dog alerts. No one would feel free to leave in that situation, yet now warnings were provided. As to the interrogation by Agents Butler and

//

[7] In *Dickerson v. United States*, 530 U.S. 428 (2000), the Supreme Court held that *Miranda* rights are no longer merely prophylactic, but are of constitutional dimension. *Id.* at 2336 ("we conclude that *Miranda* announced a constitutional rule").

Camacho, the government has not yet produced the warning provided to Mr. Orozco Aguirre, so he cannot address its adequacy in the instant pleading.

**2. The Government Bears a Heavy Burden to Demonstrate a Valid Waiver.**

The government, not the defense, bears the burden of proving a valid *Miranda* waiver.

> If the interrogation continues without the presence of an attorney and a statement is taken, *a heavy burden rests on the government* to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

*Miranda*, 384 U.S. at 475 (citing *Escobedo v. Illinois*, 378 U.S. 478, 490 n. 14 (1963)) (emphasis added).[8]

The government's "heavy burden," id., cannot be met absent evidence of proper warnings and a knowing and intelligent waiver.

> "Presuming a waiver from a silent record is impermissible. The record must show, or there must be an allegation *and* evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not a waiver."

*Id.* (quoting *Carnley v. Cochran*, 369 U.S. 506, 516 (1942)) (emphasis added). In short,

> [t]he warnings required and the waiver necessary in accordance with [the *Miranda*] opinion . . . are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant.

*Id.* at 476. As a consequence, "[t]here is a presumption against waiver." *See United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (citations omitted). *See also id.* at 537 ("the court will 'indulge every reasonable presumption against waiver of fundamental constitutional rights.'") (quoting *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1986)).

The validity of a purported waiver depends "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (internal quotations and citations omitted). In *Derrick v. Peterson*, 924 F.2d 813 (9th Cir. 1990), this Court confirmed that the issue of the validity of a *Miranda* waiver requires a two prong analysis:

---

[8] Although the burden is "heavy," the Ninth Circuit stated, in a post-*Dickerson* decision, that the government must carry its burden by a preponderance of the evidence. *See United States v. Crews*, 502 F.3d 1130, 1139-40 (9th Cir. 2007). *Crews* is wrongly decided. Because *Dickerson* holds that the warnings are constitutionally based, the Government bears the burden of demonstrating a *Miranda* waiver by clear and convincing evidence. *See Schell v. Witek*, 218 F.3d 1017, 1023 (9th Cir. 2000) (en banc) (constitutional rights may ordinarily be waived only if it can be established by clear and convincing evidence that the waiver is voluntary, knowing, and intelligent) (citations omitted).

the waiver must be both (1) voluntary, and (2) knowing and intelligent. *Id.* at 820. The voluntariness prong of this analysis "is equivalent to the voluntariness inquiry under the [Fifth] Amendment . . . ." *Id.*

The second prong, however, requiring that the waiver be "knowing and intelligent," mandates an inquiry into whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 820-21 (quoting *Colorado v. Spring*, 479 U.S. 564, 573 (1987)). This inquiry requires that the court determine whether "the requisite level of comprehension" existed before the purported waiver may be upheld. *Id.* Thus, "[o]nly if the `totality of the circumstances surrounding the interrogation' reveal *both* an uncoerced choice *and* the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting *Colorado v. Spring*, 479 U.S. at 573) (emphasis in original) (citations omitted)).

To satisfy this burden, the prosecution must introduce evidence sufficient to establish “that under the ‘totality of the circumstances,’ the defendant was aware of 'the nature of the right being abandoned and the consequences of the decision to abandon it.'” *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Thus, the requirement that any waiver be knowing and intelligent mandates an inquiry into Mr. Orozco Aguirre's subjective understanding of the *Miranda* rights and the consequences of forgoing them.

That inquiry cannot be conflated with the question of the voluntariness of any purported waiver. The requirement that any waiver be knowing and intelligent is completely distinct from the voluntariness analysis: “police coercion is a necessary prerequisite to a determination that the waiver was involuntary [but does] not bear[] on the separate question whether the waiver was knowing and intelligent.” *United States v. Bradshaw*, 935 F.3d 295, 299 (D.C. Cir. 1991). *Accord United States v. Cristobal*, 293 F.3d 134, 142 (4th Cir. 2002) ("Because a waiver may very well have been voluntary (that is, uncoerced) and yet given without a knowing and intelligent waiver of *Miranda* rights, ..., it is not enough for us to find that Cristobal voluntarily waived his rights.") (citation omitted).

In addition to these general principles, the Ninth Circuit's case law plainly puts the onus on the government when it deals with suspects of limited education, and who lack familiarity with American culture, to explain rights with "thoroughness and clarity." *See United States v. Perez-Lopez*, 348 F.3d 839, 848 (9th Cir. 2003). *Accord San Juan-Cruz*, 348 F.3d at 389. In short, "*Miranda* ... requires 'meaningful

advice to the unlettered and unlearned in language which [they] can comprehend and on which [they] can knowingly act.'" *Id.* (quoting *San Juan-Cruz*, 348 F.3d at 388) (brackets in original).

Again, the current record does not permit a finding that the government met this high standard, particularly because the content of any admonition is unknown.

**B. Any Statements by Mr. Orozco Aguirre Were Involuntary.**

Even when the procedural safeguards of *Miranda* have been satisfied, a defendant in a criminal case is deprived of due process of law if the conviction is founded upon an involuntary confession. *Arizona v. Fulminante*, 499 U.S. 279 (1991); *Jackson v. Denno*, 378 U.S. 368, 387 (1964). *See also* 18 U.S.C. § 3501. The government bears the burden of proving by a preponderance of the evidence that a confession is voluntary. *Lego v. Twomey*, 404 U.S. 477, 483 (1972).

In order to be voluntary, a statement must be the product of a rational intellect and free will. *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). In determining whether a defendant's will was overborne in a particular case, the totality of the circumstances must be considered. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Some factors taken into account have included the youth of the accused, his lack of education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. *Id.*

A confession is deemed involuntary whether coerced by physical intimidation or psychological pressure. *Townsend v. Sain*, 372 U.S. 293, 307 (1962). "The test is whether the confession was `extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *See Hutto v. Ross*, 429 U.S. 28, 30 (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). *Accord United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981).

Until the government meets its burden of showing all statements of the defendant that it intends to use at trial were voluntary, all statements -- even those taken before he was in "custody" -- must be suppressed as involuntary.

**C. Mr. Orozco Aguirre Requests That This Court Conduct An Evidentiary Hearing.**

This Court must make a factual determination as to whether a confession was voluntarily given prior to its admission into evidence. *See Lego v. Twomey*, 404 U.S. at 483; 18 U.S.C. § 3501(a). Where a factual

determination is required, courts are obligated by Fed. R. Crim. P. 12 to make factual findings. *See United States v. Prieto-Villa*, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" id. at 609-10 (quoting *Waller v. Georgia*, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.[9]

Under section 3501(b), this Court must consider various enumerated factors in making the voluntariness determination, including whether the defendant understood the nature of the charges against him and whether he understood his rights. Without the presentation of evidence, this Court cannot adequately consider these statutorily mandated factors. Mr. Orozco Aguirre accordingly requests that this Court conduct an evidentiary hearing pursuant to 18 U.S.C. § 3501(a), to determine, outside the presence of the jury, whether any statements made by him were voluntary.

## VI.

## THE EVIDENCE SEIZED FROM THE TRUCK DRIVEN BY MR. OROZCO AGUIRRE MUST BE SUPPRESSED DUE TO VIOLATIONS OF THE FOURTH AMENDMENT.

Mr. Orozco Aguirre moves the Court to suppress evidence, based on the following Fourth Amendment violations: (1) violations with respect to the search and seizure at the Highway 86 checkpoint; and (2) the warrantless search of the tractor/trailer.

### A. Background

At the time counsel is writing this portion of this pleading, Mr. Orozco Aguirre has received very little discovery. Accordingly, these motions are primarily based on defense counsel's information and belief.

Given this situation, Mr. Orozco Aguirre will set out his motions in a manner that is within the general contours of the government's factual recitations, but he does not concede the veracity of anything the government has asserted in that regard.

//

---

[9] An evidentiary hearing is the only way to assure that there is a complete and impartial determination of whether the defendant knowingly and voluntarily waived his rights. Surely, this Court would not rely on the unsworn assertions of the *opposing* party in determining whether the waiver of the Sixth Amendment right to counsel was knowing and voluntary. The waiver of important rights guaranteed by the Fifth Amendment should be no different.

**B. Checkpoint Related Issues**

Based on what defense counsel knows at this time, Mr. Orozco Aguirre raises four general issues (which contain sub-issues) with respect to the checkpoint search of the tractor/trailer: (1) the "immigration" checkpoint is impermissibly being used for general law enforcement purposes (*i.e.*, to search for drugs), and was so used in this case; (2) Mr. Orozco Aguirre was impermissibly referred to secondary inspection; (3) any consent to search was invalid; and (4) without establishing that the narcotic detector dog is reliable, the government cannot rely on its alleged alert to provide probable cause for the search, and without an alert there was no probable cause. Accordingly, the Court should suppress the fruits, including physical evidence, contraband and statements, of any violations it finds.

**1. The Immigration Checkpoint Is Impermissibly Being Used For General Law Enforcement Purposes (*i.e.*, To Search For Drugs), And Was So Used In This Case.**

It is plain from the facts of this case that the government is using the Highway 86 checkpoint for general law enforcement purposes; *i.e.*, to look for drugs. Specifically, Agent Delgado was performing a pre-primary inspection with a dog trained to detect "the odors of narcotics and their derivatives." *See* Ex. A at 2. Delgado's report does not state that Rambo-C is capable of discerning whether a person is presently located in the rear of a tractor trailer.[10] The fact that a Border Patrol Agent is performing drug interdiction activities at a purported immigration checkpoint, prior to any sort of inspection or even suggestion that there is a need for an immigration inspection, is strongly suggestive of the fact that the Border Patrol is using the "immigration" checkpoint for general law enforcement purposes.

These facts suggest a programmatic Fourth Amendment violation, as well as an individual violation of Mr. Orozco Aguirre's Fourth Amendment rights. *See generally City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) (striking down a drug checkpoint). *See also United States v. Faulkner*, 450 F.3d 466, 470 (9th Cir. 2006) ("First, we must determine whether the primary purpose of the [checkpoint] was to advance 'the general interest in crime control.'") (quoting *Edmond*, 531 U.S. at 48). As Chief Judge Kozinski has observed, "[t]here's reason to suspect the agents working these checkpoints are looking for more than illegal

---

[10] In the instant motion, the defense has requested discovery regarding the capabilities of Rambo-C and Agent Delgado.

aliens. If this is true, it subverts the rationale of *Martinez-Fuerte*[11] and turns a legitimate administrative search into a massive violation of the Fourth Amendment." *United States v. Soyland*, 3 F.3d 1312, 1316 (9th Cir. 1993) (Kozinski, J., dissenting). A stop at a checkpoint that is not operated for a single, legitimate purpose is "per se invalid." *See Faulkner*, 450 F.3d at 470.

While neither *Edmond*[12] nor *Faulkner* resolves the questions of whether a checkpoint may be invalid if one of its primary purposes is general law enforcement, or if general law enforcement is a secondary, programmatic purpose, it is clear that courts evaluating checkpoints must determine the extent to which general law enforcement is a programmatic goal of the operation of the checkpoint. *Cf. Ferguson v. Charleston*, 532 U.S. 67, 84 (2001) (where a primary purpose of a program authorizing a suspicionless Fourth Amendment intrusion is the "general crime control ends" of governmental authorities, the program "simply does not fit within the closely guarded category of 'special needs'"). The Court has made clear that "'special needs'" are "concerns other than crime detection," *Chandler v. Miller*, 520 U.S. 305, 314 (1997), and emphasized that point in holding that the Fourth Amendment prohibits a public hospital from providing the results of blood tests showing that expectant mothers were using cocaine to the police. *See Ferguson*, 532 U.S. 67. In doing so, the Court found that the case did not fall within the special needs exception it had recognized for certain administrative searches even though the ultimate goal of the program was to get the women off drugs. *See id.* at 82-83.

> Because law enforcement involvement always serves some broader social purpose or objective, under respondents' view, virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate purpose. Such an approach is inconsistent with the Fourth Amendment.

*Id.* at 84 (footnote omitted).

*Ferguson* emphasized that the special needs exception was a narrow one that only applies when the "justification for the absence of a warrant or individualized suspicion was one divorced from the State's general interest in law enforcement." *Id.* at 79; *see also id.* at 74 n.7, 77. Thus, "[t]he fact that positive tests

---

[11] *See United States v. Martinez-Fuerte*, 428 U.S. 543 (1976).

[12] *See Edmond*, 531 U.S. at 47 n.2 ("[W]e need not decide whether the State may establish a checkpoint program with the primary purpose of checking licenses or driver sobriety and a secondary purpose of interdicting narcotics.").

results were turned over to the police does not merely provide a basis for distinguishing our prior cases applying the 'special needs' balancing approach to the determination of drug use. It also provides an affirmative reason for enforcing the strictures of the Fourth Amendment." *Id.* at 84.

Consequently, *Edmond*, 531 U.S. 32, the Supreme Court rejected application of the special needs exception to "a highway checkpoint whose primary purpose is the discovery and interdiction of illegal narcotics." *Id.* at 34. Analyzing the checkpoints at issue in *Edmond*, the Court was required to confront its previous opinions approving checkpoints designed to detect impaired drivers, *see Michigan State Police Department v. Sitz*, 496 U.S. 450 (1990), and undocumented immigrants. *See Martinez-Fuerte*, 428 U.S. 543. *Edmond* ultimately concluded that "what principally distinguishes [the Indianapolis] checkpoints from those we have previously approved is their primary purpose." 531 U.S. at 40.

*Edmond* made clear that the Court never "indicate[d] approval of a checkpoint program whose primary purpose was to detect evidence of criminal wrongdoing." *Id.* at 37-38. Although it acknowledged that drug offenses pose a significant problem, as do drunken drivers, that alone cannot justify wide-ranging Fourth Amendment intrusions.

> But gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose. Rather, in determining whether individualized suspicion is required, we must consider the nature of the interests threatened and the connection to the particular law enforcement practices at issue. We are particularly reluctant to recognize exceptions to the general rule of individualized suspicion where the governmental authorities primarily pursue their general crime control ends.

*Id.* at 42-43.

That "reluctance," *id.*, has informed the Supreme Court's special needs jurisprudence: "[i]n none of our previous special needs cases have we upheld the collection of evidence for criminal law enforcement purposes." *Ferguson*, 532 U.S. at 83 n.20.[13] *Accord Soyland*, 3 F.3d at 1318 (When agents pursue general

---

[13] Indeed, most of the Supreme Court's cases make clear that there is little expectation the evidence gathered in a legitimate special needs search will be employed in a criminal prosecution. *See, e.g., Board of Education v. Earls*, 536 U.S. 822, 829 (2002) ("the School District's [drug testing] policy is not in any way related to the conduct of criminal investigations"); *Vernonia School District 47J v. Acton*, 515 U.S. 646, 658 (1995) (drug tests results "are not turned over to law enforcement authorities"); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 663 (1989) (drug "[t]est results may not ... be turned over to any other agency, including criminal prosecutors, without the employee's written consent"); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 621 n.5 (1989) (no indication that drug test results were "intended to be [disclosed to law enforcement authorities], or actually ha[d] been [so disclosed]"). While

law enforcement goals, "[d]iscovery of ... contraband ... is no longer an accident; it is a systematic wrenching of the administrative search from its constitutional roots.") (Kozinski, J., dissenting). Justice Kennedy's concurrence in *Ferguson* perhaps states the principle most clearly: "[t]he traditional warrant and probable cause requirements are waived in our previous [special needs] cases on the explicit assumption that the evidence obtained in the search is not intended to be used for law enforcement purposes." *Id.* at 88 (Kennedy, J., concurring).[14] This Court must therefore analyze the primary purposes of the Highway 86 checkpoint, an analysis that must be informed by Border Patrol's decision to employ pre-primary examinations by narcotics detector dogs. That policy decision[15] demonstrates that the "justification for the absence of a warrant or individualized suspicion was [not] one divorced from the State's general interest in law enforcement." *Ferguson*, 532 U.S. at 79. *Cf. Sullivan v. Louisiana*, __ U.S. __, 2008 WL 723750, *8 (March 19, 2008) (noting that in some discriminatory intent cases, the burden of proof shifts upon a showing of discrimination as a "substantial or motivating factor," but not deciding whether that standard applies to evaluation of peremptory challenges). Given that general law enforcement purposes, i.e., drug interdiction, are certainly a primary motivating force for operation of the Highway 86 checkpoint, and, at any rate, the programmatic purposes of the operation of the checkpoint are not "divorced from the State's general interest in law enforcement," *see id.*, the Court should grant the motion to suppress. *See* 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.6(b), at 148 (2004) ("Surely an illegal multi-purpose checkpoint cannot be made legal by the simple device of assigning 'the primary purpose' to one objective instead of the other....").

//

---

evidence gathered at the sobriety checkpoints at issue in Sitz did result in the arrest of intoxicated motorists, *see Sitz*, 496 U.S. at 448, that "checkpoint program was clearly aimed at reducing the immediate hazard posed by the presence of drunk drivers on the highways, and there was an obvious connection between the imperative of highway safety and the law enforcement practice at issue." *Edmond*, 531 U.S. at 39.

[14] Nothing in *Illinois v. Lidster*, 540 U.S. 419 (2004), suggests that a different analysis should apply; "[t]he ... primary law enforcement purpose [of the stop in *Lidster*] was *not* to determine whether a vehicle's occupants were committing a crime, but to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others." 540 U.S. at 423 (emphasis in original).

[15] "[T]he purpose inquiry in this context is to be conducted at the programmatic level and is not an invitation to probe the minds of individual officers acting at the scene." *See Edmond*, 531 U.S. at 48.

In the event the government disagrees, Mr. Orozco Aguirre requests that the government be required to produce discovery on this issue, including any materials (written, recorded, videotaped, *etc.*) pertaining to the Border Patrol policy, procedure, and practice with respect to searching for drugs or other contraband at the Highway 86 checkpoint, or immigration checkpoints generally, as well as the policy of undertaking pre-primary narcotics detector dog analysis. Mr. Orozco Aguirre also requests that the government be required to provide data regarding the number of searches and arrests at the Highway 86 checkpoint over the past two years, the reasons for the searches (if known), and the charges leveled upon arrest, if any. Mr. Orozco Aguirre also requests that the Court order the government to produce the names of those responsible for training and implementing Border Patrol policy regarding searching for contraband at the Highway 86 checkpoint, so such people may be subpoenaed to testify before this Court. Finally, Mr. Orozco Aguirre requests that the Court order production discovery regarding the issues set forth in footnote 13 to Judge Kozinski's *Soyland* dissent. *See Soyland*, 3 F.3d at 1319 n.13 (Kozinski, J., dissenting).

**2. Mr. Orozco Aguirre Was Impermissibly Referred To Secondary Inspection, And The Wait In Secondary Inspection Was Unreasonable**

Mr. Orozco Aguirre was impermissibly referred to secondary inspection, and the scope of his detention there, before any search was conducted, or consent was obtained, violated the Fourth Amendment.

In *Martinez-Fuerte*, 428 U.S. 543, the Supreme Court indicated that while immigration checkpoints are permissible, they must be "limited to the types of stops described in [its] opinion. Any further detention . . . must be based on consent or probable cause." 428 U.S. at 567. Regarding the scope of the stop, *Martinez-Fuerte* only permits agents to request "a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States," and conduct a "visible inspection of the vehicle limited to what can be seen without a search." *See id.* at 558 (quotation omitted); *see also Soyland*, 3 F.3d at 1318 (noting that a Fourth Amendment violation occurs "when a Border Patrol agent conducts a separate investigation after he's established there are no immigration law violations") (Kozinski, J., dissenting).

Here, Mr. Orozco Aguirre provided Agent Carney with a valid U.S. visa, *see* Ex. A at 2, but referred him to secondary inspection before he could produce his I-94. This further detention must be justified "consent or probable cause." *See Martinez-Fuerte*, 428 U.S. at 567. As to Mr. Orozco Aguirre's purported

consent to a search, the government is obliged to demonstrate that it was actually and voluntarily given. *See United States v. Rodriguez*, 464 F.3d 494, 501 (9th Cir. 2004) ("'Whether consent to search was voluntarily given is to be determined from the totality of the circumstances. It is the government's burden to prove that the consent was freely and voluntarily given.'") (quoting *United States v. Soriano*, 361 F.3d 494, 501 (9th Cir. 2004)). The government is similarly obliged to make a showing of probable cause. *See United States v. Rubalcava-Montoya*, 597 F.2d 140, 142 (9th Cir. 1978). On this record, it has done neither.

**3. Any Consent To Search Was Invalid**

The search of Mr. Orozco Aguirre's vehicle also offended the Fourth Amendment because it was not supported by a warrant.

The government likely will assert that the search of the tractor trailer driven by Mr. Orozco Aguirre's car was permissible because he consented to such a search. As an initial matter, the fact of consent iis very much in doubt because Agent Carney claims there was a consent to search the "entire" tractor trailer, while Agent Maldonado suggests that Mr. Orozco Aguirre did something wrong by opening the trailer. *See* Ex. A at 2. In any event, because the scope of the detention exceeded that permissible under *Martinez-Fuerte*, any alleged consent to search the car was invalid because it is tainted by the illegal detention. *See Florida v. Royer*, 460 U.S. 491, 502-504 (1983) (holding that because "the detention [in that case] was a more serious intrusion on [the defendant's] personal liberty than is allowable on a mere suspicion of criminal activity," the defendant's consent to search his luggage "was tainted by the illegality and was ineffective to justify the search").

Moreover, any consent cannot be said to have been voluntary because an encounter cannot be said to be consensual if a "reasonable person would have believed that he was not free to leave." *California v. Hodari D.*, 499 U.S. 621, 627-28 (1991). Mr. Orozco Aguirre was ordered to secondary by an armed, uniformed officer. In addition, his valid U.S. visa was taken from him in the primary area. Accordingly, he would not have felt free to leave.

**4. There Was No Probable Cause For The Search, Absent A Showing The Narcotic Detector Dog Was Reliable**

Finally, presumably the government will rely on the alleged dog alert to support probable cause for the search. Mr. Orozco Aguirre seeks to challenge the reliability of the dog (based on defense counsel's

broad experience indicating that such dogs are improperly trained and maintained), and thus requests discovery consistent with *United States v. Cedano-Arellano*, 332 F.3d 568, 571 (9th Cir. 2003). A copy of the dog expert's declaration supporting the discovery request in *Cedano-Arellano* is attached as Exhibit C, to make clear what Mr. Orozco Aguirre is requesting, the basis therefor, and what was ruled on in that case.

Accordingly, the government violated the Fourth Amendment by searching the car, and Mr. Orozco Aguirre's other belongings, without a warrant. Any fruits of such searches, including the drugs, should be suppressed.

## VII.

## MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

Mr. Orozco-Aguirre has received 23 pages of discovery. As information comes to light, due to the government providing additional discovery in response to these motions or an order of this Court, Mr. Orozco-Aguirre may find it necessary to file further motions. It is, therefore, requested that Mr. Orozco-Aguirre be allowed the opportunity to file further motions based upon information gained through the discovery process.

## VIII.

## CONCLUSION

For the foregoing reasons, Mr. Orozco-Aguirre respectfully requests that the Court grant the above motions.

Respectfully submitted,

Dated: March 26, 2008

/s/ Steven F. Hubachek

**STEVEN F. HUBACHEK**
Federal Defenders of San Diego, Inc.
Attorneys for Defendant
Steven_Hubachek@fd.org