# INDEX TO EXHIBITS

| | | |
|---|---|---|
| EXHIBIT A | - | Report of Border Patrol Agents Timothy Delgado and Dan Carney |
| EXHIBIT B | - | Judge Moskowitz's Order Dated October 11, 2007 Denying Motion to Dismiss Indictment |
| EXHIBIT C | - | Declaration of Dan Craig in Support of Motion to Compel Discovery |

# EXHIBIT A

# BORDER PATROL

## REPORT OF APPREHENSION OR SEIZURE

FDIN: [redacted]

| Office or Agency | |
|---|---|
| OFFICER IN CHARGE<br>DRUG ENFORCEMENT ADMINISTRATION<br>2425 LA BRUCHERIE ROAD<br>EL CENTRO, CA 92251 | File Case No: [redacted]<br>Sector [redacted]<br>Date 02/22/2008 |

Patrol Agents TIMOTHY DELGADO RAMBO-C[redacted] of the INDIO INDIO station

☐ assisted the ______ (Agency) ______ (City and State)

in the apprehension and seizure of the following:

☒ apprehended/interviewed:

| Name (Surname in CAPS) First Middle | Date and Place of Birth |
|---|---|
| OROZCO-Aguirre, Victor Manuel | 04/08/1955<br>MEXICALI, BAJA CALIFORNIA, MEXICO |
| **Address of person apprehended/interviewed**<br>AV RIO SENA 154 FRACC GRANJAS<br>VIRREYES 21190<br>MEXICALI, MEXIC | **Nationality**<br>MEXICO |

☒ and seized/xxxxxxxx

### VESSEL, VEHICLE OR AIRCRAFT

| Description (Year, Make Model, Color) | Motor or Serial No. | Registry or License No. | Value (Est.) |
|---|---|---|---|
| 1997 OTHER CONVEYANCE MAKE FREIGHTLINER<br>Blue, Dark<br>More conveyances listed in narrative section | 1FUPC24B0VP698245 | CA/UP70041 | |

### CONTRABAND, MERCHANDISE OR OTHER

| Quantity | Description | Value (Est.) |
|---|---|---|
| 308.200 LBS<br>139 KGS | MARIJUANA - 24 LARGE BRICK-LIKE BUNDLES OF GREEN LEAFY SUBSTANCE | $246,560.00 |

| Place of Apprehension or Seizure | Date and Hour | Offense |
|---|---|---|
| HIGHWAY 86 CHECKPOINT NEAR WESTMORLAND, CALIFORNIA | 02/21/2008 2335 | Controlled Substance |

**NARRATIVE:** (Include Circumstances of apprehension and seizure and facts to which apprehending officers can testify.)

VESSEL, VEHICLE OR AIRCRAFT
---------------------------

1995 OTHER CONVEYANCE MAKE STRIC White
Serial # 1S13E95345E395348 License # CA/4GM8076 Value -

..(CONTINUED ON I-831)

TIMOTHY DELGADO
Signature of Reporting Officer

Received above persons and items:

SPECIAL AGENT
Signature and Title

DRUG ENFORCEMENT ADMINISTRATION
Office or Agency

02/22/2008
Date

Details regarding "HOLD" placed

U.S. Department of Homeland Security Continuation Page for Form I44

| Alien's Name | File Number | Date |
|---|---|---|
| OROZCO-Aguirre, Victor Manuel | Event No: [redacted] | 02/22/2008 |

Narrative Title: Report of Apprehension or Seizure

Today I was assigned immigration inspection at the operational Highway 86 Checkpoint. At approximately 11:30 P.M. while conducting pre-primary screening, my service canine, Rambo-C alerted to the rear of a tractor trailer (Ca#GM8076). I immediately notified the primary agent, BPA Carney, of the alert. At that time he relayed to me that the driver was acting nervously and was trembling. BPA Carney then asked the driver (Victor Manuel OROZCO-Aguirre) for permission to search his entire truck and trailer. OROZCO agreed and pulled the vehicle into secondary.

In secondary I performed a canine sniff of the trailer and Rambo again alerted to the same area. I then asked BPA Maldonaldo to question OROZCO regarding the cargo in the trailer.

BPA Maldonaldo then approached OROZCO as he was exiting the truck. He identified himself as a Border Patrol Agent and questioned OROZCO regarding the cargo. OROZCO then stated that he was hauling empty beer bottles. BPA Maldonaldo noticed that the trailer had a seal (#126927) on the door. Without being prompted, OROZCO quickly pulled the seal off with his fingers. It appeared as though the seal had already been pulled off and then set back on to appear as if it had never been tampered with. OROZCO then opened the right door. Once open, I could see two large duffle bags propped in the rear along with a medium-sized cardboard box and a white bundle sitting atop the box. OROZCO immediately stated that he did not know how these objects got there.

After OROZCO was escorted inside the checkpoint I inspected the duffle bags and box and discovered numerous large, brick-like bundles. After transporting the bundles inside the checkpoint I randomly probed one of the bundles and discovered a green leafy substance inside. This substance tested positive for the properties of Marijuana.

The bundles had an initial layer of aluminum foil, followed by a layer of packing tape, red jelly, laundry detergent, and finally cellophane. BPA Carney and I counted and weighed the bundles. Overall we seized 24 bundles weighing 308.2 lbs. The driver, truck, trailer, and bundles were turned over to the custody of the Drug Enforcement Administration.

Rambo-C and I are a certified United States Border Patrol Detection Team. We are certified in the detection of concealed humans and the odors of narcotics and their derivatives.

A TECS lane check on the truck and trailer yielded recent crossings through the Calexico East Port of Entry. The trailer showed crossings on 2/22/2008 (7:30 P.M.), 02/08/2008 (9:16 A.M.) and 02/08/2008 (10:46 A.M.). The truck showed crossings on 2/21/2008 (1:33 P.M.) 2/19/2008 (7:34 A.M.) 2/16/2008, 2/14/2008, 2/13/2008, AND 2/12/2008.

ADDENDUM BY AGENT DAN CARNEY

On today's date I was assigned immigration inspection duty at the operational Highway 86 Checkpoint. At approximately 11:30 P.M. while working primary inspection I encountered a blue semi truck driven by Victor Manuel OROZCO-Aguirre. I identified myself as a Border Patrol Agent and questioned him regarding his citizenship. OROZCO stated that he was from Mexico and presented me with a valid U.S. Visa. I then asked for his I-94. ORZCO then handed me the bill of lading for his cargo. As he did, I noticed that his hands were shaking. I then asked for his I-94 again. This time he began fumbling for his wallet. As he was searching for his document, Agent Delgado notified me that his service canine had alerted to the trailer. I then asked OROZCO for permission to search his entire vehicle and trailer. He...(CONTINUED ON NEXT PAGE)

| Signature | Title |
|---|---|
| TIMOTHY DELGADO | BORDER PATROL AGENT |

2 of 3 Pages

Form I 831 Continuation Page (Rev. 08/01/07)

10

U.S. Department of Homeland Security

Continuation Page for Form I44

| Alien's Name | File Number | Date |
|---|---|---|
| OROZCO-Aguirre, Victor Manuel | Event No: [redacted] | 02/22/2008 |

agreed and pulled into secondary.

| Signature | Title |
|---|---|
| TIMOTHY DELGADO | BORDER PATROL AGENT |

3 of 3 Pages



11

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,
Plaintiff,
v.
MANUEL MARTINEZ-COVARRUBIAS,
Defendant.

CASE NO. 07cr0491 BTM

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

Defendant Manuel Martinez-Covarrubias has filed a Motion to Dismiss the Indictment Due to Erroneous Grand Jury Instruction. For the reasons discussed below, Defendant's motion is **DENIED**.

## I. BACKGROUND

On February 28, 2007, a federal grand jury empaneled in this district on January 11, 2007 returned a two-count Indictment charging Defendant with Importation of Methamphetamine, in violation of 21 U.S.C. §§ 952 and 960, and Possession of Methamphetamine with Intent to Distribute, in violation of 21 U.S.C. § 841(a)(1).

## II. CHALLENGED INSTRUCTIONS

### A. Video Presentation

Prior to the selection of the grand jury jury, the potential grand jurors were shown a video titled "The Federal Grand Jury: The People's Panel." The video's apparent purpose is to educate potential grand jurors about their civic duty to serve, the function of the grand jury, and their responsibilities as grand jurors.

The video presents the story of a woman who serves on a grand jury for the first time. In one scene, after the woman receives the summons, her son tells her what he has learned about the function of a grand jury. Reading from a civics book, the son states that if the "jury finds that probable cause does exist, then it will return a written statement of charges called an indictment . . . ."

When charging the impaneled grand jury, the fictional judge explains that if the grand jury finds that there is probable cause, "you will return an indictment."

Later, the foreperson tells the other grand jurors that there are two purposes of the grand jury: (1) when there is a finding of probable cause, to bring the accused to trial fairly and swiftly; and (2) to protect the innocent against unfounded prosecution.

B. Voir Dire Session

Before commencing voir dire, the empaneling judge, the Hon. Larry A. Burns, explained the function of the grand jury to the prospective jurors as follows: "The grand jury is determining really two factors: 'Do we have a reasonable – collectively, do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?' If the answer is 'yes' to both of those, then the case should move forward. If the answer to either of the questions is 'no,' then the grand jury should hesitate and not indict." App. 2 to Gov't Response at 8.

During voir dire, Judge Burns explained to the potential grand jurors that the presentation of the evidence to the grand jury was going to be one-sided. Id. at 14. However, Judge Burns stated, "Now, having told you that, my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." Id. at 14-15.

One prospective juror, a retired clinical social worker, indicated that he did not believe that any drugs should be considered illegal. Id. at 16. He also stated that he had strong feelings about immigration cases and thought the government was spending a lot of time unnecessarily persecuting people. Id. The following exchange occurred:

> The Court: Now, the question is can you fairly evaluate those cases? Just as the Defendant ultimately is entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what our Government is doing. I disagree with these laws, so I"m not going to vote for it to go forward." If that's your frame of mind, then probably you shouldn't serve. Only you can tell me that.
>
> Prospective Juror: Well, I think I may fall in that category.
>
> The Court: In the latter category?
>
> Prospective Juror: Yes.
>
> The Court: Where it would be difficult for you to support a charge even if you thought the evidence warranted it?
>
> Prospective Juror: Yes.
>
> The Court: I'm going to excuse you, then. I appreciate your honest answers.

Id. at 16-17.

Later, another prospective juror, a real estate agent, expressed a concern regarding the disparity between state and federal law with respect to medical marijuana. Judge Burns responded:

> Well, those things – the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that – we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision and look at the facts and make a determination of whether there was a [sic] probable cause.

Id. at 25.

Subsequently, the prospective juror stated that he felt that drugs should be legal and that rapists and murderers, not people using drugs, should go to jail. Id. at 25-26. The following exchange ensued:

> The Court: I think rapists and murderers ought to go to jail too. It's not for me as a judge to say what the law is. We elect legislators to do that. We're sort of at the end of the pipe on that. We're charged with enforcing the laws that Congress gives us.
>
> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."
>
> You'd have a similar obligation as a grand juror even though you might

> have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it but you'd vote against criminalizing some drugs.
>
> That's not what your prerogative is here. Your prerogative instead is to act like a judge and to say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.
>
> I can understand if you tell me, "Look, I get all that, but I just can't do it or I wouldn't do it." I don't know what your frame of mind is. You have to tell me about that.
>
> Prospective Juror: I'm not comfortable with it.
>
> The Court: Do you think you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?
>
> Prospective Juror: It would depend upon the case.
>
> The Court: Is there a chance that you would do that?
>
> Prospective Juror: Yes.
>
> The Court: I appreciate your answers. I'll excuse you at this time.

Id. at 26-28.

Later, a potential juror said that he was "soft" on immigration because he had done volunteer work with immigrants in the field, but that he could be fair and objective. Judge Burns stated: "As you heard me explain earlier to one of the prospective grand jurors, we're not about trying to change people's philosophies and attitudes here. That's not my business. But what I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." Id. at 61. This juror was not excused.

C. Charge to Impaneled Grand Jury

After the grand jury was impaneled, Judge Burns gave further instructions regarding the responsibilities of the grand jurors.

With respect to the enforcement of federal laws, Judge Burns explained:

> But it's not for you to judge the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity is [sic] criminal is not up to you. That's a judgment that Congress makes.
>
> And if you disagree with that judgment made by Congress, then your

> option is not to say, 'Well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of [indictment] even though the evidence may be insufficient.' Instead, your obligation is to contact your congressman or advocate for a change in the laws, but not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting.
>
> Furthermore, when you're deciding whether to indict or not to indict, you shouldn't be concerned with punishment that attaches to the charge. I think I also alluded to this in the conversation with one gentleman. Judges alone determine punishment. We tell trial juries in criminal cases that they're not to be concerned with the matter of punishment either. Your obligation at the end of the day is to make a business-like decision on facts and apply those facts to the law as it's explained and read to you.

App. 1 to Gov't Response at 8-9.

With respect to exculpatory evidence, Judge Burns stated: "As I told you, in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." Id. at 20. Later, Judge Burns said, "If past experience is any indication of what to expect in the future, then you can expect that the U.S. Attorneys that will appear in front of you will be candid, they'll be honest, that they'll act in good faith in all matters presented to you." Id. at 27.

## III. DISCUSSION

A. Instructions Re: Role of Grand Jury

Defendant contends that statements made in the video, Judge Burns' instructions, and the dismissal of two potential jurors deprived Defendant of the traditional functioning of the Grand Jury. Specifically, Defendant claims that the challenged statements in combination with the dismissal of the two potential jurors "flatly prohibited grand jurors from exercising their constitutional discretion to not indict even if probable cause supports the charge." (Def.'s Reply Br. 8.) Looking at the video presentation and the instructions as a whole, the Court disagrees.

Judge Burns made it clear that the jurors were not to refuse to indict in the face of probable cause *on the ground that they disagreed with Congress's decision to criminalize certain activity*. Judge Burns did not err in doing so. In United States v. Navarro-Vargas, 408

F.3d 1184 (9th Cir. 2005) ("Navarro-Vargas II"), the Ninth Circuit upheld the model grand jury instruction that states: "You cannot judge the wisdom of the criminal laws enacted by Congress, that is, whether or not there should or should not be a federal law designating certain activity as criminal. That is to be determined by Congress and not by you." The majority opinion observed that the instruction was not contrary to any long-standing historical practice surrounding the grand jury and noted that shortly after the adoption of the Bill of Rights, federal judges charged grand juries with a duty to submit to the law and to strictly enforce it. Id. at 1193,1202-03. "We cannot say that the grand jury's power to judge the wisdom of the laws is so firmly established that the district court must either instruct the jury on its power to nullify the laws or remain silent." Id. at 1204.

A prohibition against judging the wisdom of the criminal laws enacted by Congress amounts to the same thing as a prohibition against refusing to indict based on disagreement with the laws. It is true that Judge Burns used stronger language that, viewed in isolation, could be misconstrued as requiring the return of an indictment in *all* cases where probable cause can be found. Particularly troubling is the following statement made to the real estate agent: "Your prerogative instead is to act like a judge and to say, 'All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does.' *And then your obligation*, if you find those things to be true, *would be to vote in favor of the case going forward*." App. 2 to Gov't Response at 26. However, viewed in context, Judge Burns was not mandating the issuance of an indictment in *all* cases where probable cause is found; he was explaining that disagreement with the laws should not be an obstacle to the issuance of an indictment.[1]

Furthermore, the word "obligation" is not materially different than the word "should."

---

[1] The Supreme Court has recognized that a grand jury is not required to indict in every case where probable cause exists. In Vasquez v. Hillery, 474 U.S. 254, 263 (1986), the Supreme Court explained: "The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense - all on the basis of the same facts. Moreover, '[t]he grand jury is not bound to indict in every case where a conviction can be obtained.' United States v. Ciambrone, 601 F.2d 616, 629 (2d Cir. 1979) (Friendly, J., dissenting)."

In Navarro-Vargas II, the majority opinion held that the model instruction that the jurors "should" indict if they find probable cause does not violate the grand jury's independence. The majority explained, "As a matter of pure semantics, it does not 'eliminate discretion on the part of the grand jurors,' leaving room for the grand jury to dismiss even if it finds probable cause." Navarro-Vargas II, 408 F.3d at 1205 (quoting United States v. Marcucci, 299 F.3d 1156, 1159 (9th Cir. 2002)). The dissenting opinion notes that the word "should" is used "to express a duty [or] *obligation*." Id. at 1121 (quoting The Oxford American Diction And Language Guide 931 (1999))(emphasis added).[2]

Defendant points to the language in the video where first the son, then the judge, state that if there is a finding of probable cause, the grand jury "will" return an indictment. However, no emphasis is placed on the word "will." As spoken by the actors, the statements are not directives, mandating the return of an indictment upon the finding of probable cause, but, rather, descriptions of what is expected to occur. Similarly, the foreperson's statement that one of the purposes of the grand jury is to bring an accused to trial when there is a finding of probable cause is a general statement of the grand jury's function, not a command to return an indictment in *every* case where probable cause exists.

Defendant also argues that Judge Burns improperly forbade the grand jury from considering the potential punishment for crimes when deciding whether or not to indict. Defendant relies on the following statement:

> Well, those things – the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that – we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. *We'd ask you to also abide by that.* We want you to make a business-like decision and look at the facts and make a determination of whether there was a probable cause.

App. 2 to Gov't Response at 25. (Emphasis added.) Although Judge Burns stated that trial jurors *cannot* consider punishment, he did not impose such a restriction on the grand jurors. Instead, Judge Burns *requested* that the grand jurors follow the same principle. Similarly,

---

[2] Defendant concedes that at other times Judge Burns instructed that upon a finding of probable cause, the case "should" go forward. App. 2 to Gov't Response at 8, 17; App. 1 to Gov't Response at 4, 23.

during the formal charge, Judge Burns stated, "[y]ou *shouldn't* be concerned with punishment that attaches to the charge." App. 1 to Gov't Response at 8. (Emphasis added.)

In United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006), the Ninth Circuit upheld a jury instruction that stated: "[W]hen deciding whether or not to indict, you *should not* be concerned about punishment in the event of conviction; judges alone determine punishment." (Emphasis added.) Consistent with the reasoning in Marcucci and Navarro-Vargas II, the Ninth Circuit held that the instruction did not place an absolute bar on considering punishment and was therefore constitutional. The instructions given by Judge Burns regarding the consideration of punishment were substantially the same as the instruction in Cortez-Rivera.

Neither Judge Burns nor the video pronounced a general prohibition against jurors exercising their discretion to refuse to return an indictment in the face of probable cause. In any case, "history demonstrates that grand juries do not derive their independence from a judge's instruction. Instead they derive their independence from an unreviewable power to decide whether to indict or not." Navarro-Vargas II, 408 F.3d at 1204.

Both the video and Judge Burns informed the jurors about the utmost secrecy of the grand jury proceedings and their deliberations. The video and Judge Burns also emphasized to the jury that they were independent of the Government and did not have to return an indictment just because the Assistant U.S. Attorney asked them to. In the video, the judge expressed approval at the fact that the grand jury did not return an indictment as to the alleged driver of the get-away car. Judge Burns characterized the jury as "a buffer between our Government's ability to accuse someone of a crime and then putting that person through the burden of standing trial." App. 1 to Gov't Response at 26. Judge Burns also told the jurors that they were not to be a "rubber stamp" and were expected to depend on their independent judgment. Id. at 27.

Even though the jurors were not explicitly instructed that they could use their discretion to refuse to return an indictment, they retained that power by virtue of the secrecy surrounding their deliberations and the unreviewability of their decisions. Nothing that Judge

Burns said or did impinged on the jurors' independence in this regard.

Defendant counters that the dismissal of the two potential jurors undermined the grand jury's independence from the very start. According to Defendant, when Judge Burns dismissed the jurors, the message was clear that they were to indict in every case where there was probable cause or they would be excused. Defendant contends that the remaining grand jurors could not have understood Judge Burns' actions in any other way. (Reply Br. 18.) The Court disagrees.

Upon reading the voir dire transcript, it is apparent that the jurors were excused because they were biased against the government with respect to a whole category of criminal laws, not simply because they were independent-minded and might refuse to return an indictment in a case where probable cause exists. Judge Burns explained to the clinical social worker, "We're all products of our experience. We're not going to try to disabuse you of experiences or judgments that you have. What we ask is that you not allow those to control invariably the outcome of the cases coming in front of you; that you look at the cases fresh, you evaluate the circumstances, listen to the witness testimony, and then make an independent judgment." App. 2 to Gov't Response at 15. Judge Burns excused the social worker after he admitted that it would be difficult for him to return an indictment in drug or immigration cases.

Similarly, the real estate agent expressed that he thought drugs should be legal and that people using drugs should not be sent to jail. App. 2 to Gov't Response at 25-26. The real estate agent said that he was not comfortable with indicting in drug cases. Although he did not say that he would refuse to indict in all cases involving drugs, he admitted that because of his beliefs, there was a chance that he would refuse to return an indictment in a drug case even though there was probable cause. Id. at 27. The real estate agent's responses established that he had serious concerns regarding the criminalization of drugs and could not be impartial with respect to these cases

That bias was the reason for the dismissal of the first two potential jurors is confirmed by the dismissal of a third potential juror. This juror stated that he had a strong bias for the

Government. App. 2 to Gov't Response at 38. Judge Burns cautioned the juror that he should not "automatically defer to [the Government] or surrender the function and give the indictment decision to the U.S. Attorney. You have to make that independently." Id. at 40. Judge Burns emphasized once again the responsibility of the jurors to evaluate the facts of each case independently based on the evidence presented. Id. at 42-43. Demonstrating his even-handedness, Judge Burns explained, "I'm equally concerned with somebody who would say, 'I'm going to automatically drop the trap door on anybody the U.S. Attorney asks.' I wouldn't want you to do that." Id. at 44.

A reasonable grand juror would not have interpreted the dismissal of the first two potential jurors as a message that they must indict in all cases where probable cause is found or risk being excused from service. It was apparent to the other jurors that a lack of impartiality with respect to certain types of cases, *not* independence, was the reason for all three dismissals.

In sum, Judge Burns did not err in instructing the grand jurors that they were not to refuse to return an indictment on the ground that they disagreed with the laws. Furthermore, nothing in the video or Judge Burns' instructions nullified the grand jury's inherent power to refuse to indict for any reason whatsoever. As the Ninth Circuit noted in Navarro-Vargas II, 408 F.3d at 1204, the grand jury's independence results from the secrecy of their deliberations and the unreviewability of their decisions. Nothing in the record shows any impediment to that independence.

B. Instructions re: Assistant U.S. Attorneys

Defendant also contends that Judge Burns committed structural error by making comments about the Assistant U.S. Attorney's duty to present evidence that "cuts against the charge." According to Defendant, not only did Judge Burns' comments contradict United States v. Williams, 504 U.S. 36 (1992), but also discouraged independent investigation, leading to inaccurate probable cause determinations. Defendant reasons that given Judge Burns' comments, the grand jurors would have assumed that if the prosecutor did not present

any exculpatory evidence, then none exists, rendering further investigation a waste of time.

Under Williams, prosecutors do not have a duty to present substantial exculpatory evidence to the grand jury. Although Assistant U.S. Attorneys apparently have an employment duty to disclose "substantial evidence that directly negates the guilt" of a subject of investigation (United States Attorneys' Manual § 9-11.233), it does not appear that they have a broad duty to disclose all evidence that may be deemed exculpatory or adverse to the Government's position.

Accordingly, Judge Burns' comments regarding the duty of Assistant U.S. Attorneys to present adverse evidence were inaccurate. However, Judge Burns' comments do not rise to the level of structural error. As discussed above, the video and Judge Burns stressed that the grand jury was independent of the Government. The video and Judge Burns also explained to the jury that they could direct the Assistant U.S. Attorney to subpoena additional documents or witnesses. App. 1 to Gov't Response at 11, 24. The jurors were also told about their right to pursue their own investigation, even if the Assistant U.S. Attorney disagrees with the grand jury's decision to pursue the subject. Id. at 12.

In light of the foregoing instructions, the Court does not agree that the grand jurors would assume that if the Government did not present any exculpatory evidence, none exists. A reasonable juror would understand that the Assistant U.S. Attorney may not be aware of certain exculpatory evidence, whether due to legitimate circumstances or inadequate investigation, and that further investigation by the grand jury may be needed to properly evaluate the evidence before them. Furthermore, Judge Burns told the jury that "in *most* instances" the U.S. Attorneys are duty-bound to present exculpatory evidence. App. 1 to Gov't Response at 20. Based on this qualifying language, the grand jurors would have understood that the prosecutor is not always bound to present exculpatory evidence. Thus, "the structural protections of the grand jury" have not "been so compromised as to render the proceedings fundamentally unfair." Bank of Nova Scotia v. United States, 487 U.S. 250, 257 (1988).

If Defendant can establish that the Government in fact knew of exculpatory evidence

that was not presented to the grand jury and that this failure to present exculpatory evidence, in conjunction with Judge Burns' comments, "substantially influenced the grand jury's decision to indict" or raises "grave doubt" that the decision to indict was free from the substantial influence of such events, the Court may dismiss the indictment under its supervisory powers. Bank of Nova Scotia, 487 U.S. at 256. Therefore, the Court will grant Defendant leave to conduct discovery regarding what evidence was presented to the grand jury. If, based upon the discovery, Defendant can establish that he suffered actual prejudice, Defendant may renew his motion to dismiss the indictment.

## IV. CONCLUSION

For the reasons discussed above, Defendant's Motion to Dismiss the Indictment Due to Erroneous Grand Jury Instruction is **DENIED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

DATED: October 11, 2007

Barry Ted Moskowitz

Honorable Barry Ted Moskowitz
United States District Judge

# EXHIBIT C

ORIGINAL

TODD W. BURNS
California State Bar No. 194937
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone No. (619) 234-8467

Attorneys for Mr. Cedano-Arrellano

FILED
MAR -7 2002
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HON. BARRY TED MOSKOWITZ)

UNITED STATES OF AMERICA,
Plaintiff,
v.
JUAN PABLO CEDANO-ARRELLANO,
Defendant.

Criminal No. 01CR3614-BTM

3/7/02 @ 1:30 per Todd Burns Secy.

DECLARATION OF DR. DAN CRAIG IN SUPPORT OF MOTION TO COMPEL DISCOVERY

I, Dan J. Craig, declare under penalty of perjury that:

1. I am an expert in animal behavior, and I have extensive experience training dogs to detect drugs and explosives. My experience in that area is highlighted in the curriculum vitae attached hereto.

2. In assessing the reliability of a drug detector dog, I need a great deal of information. That information, and the reasons it is relevant to my assessment, are set out below:

3. Training records, training manuals, written certification standards, and score sheets of the dog from the facility that initially trained and certified the dog to detect drugs. These documents allow me to assess if the dog was properly trained to detect drugs, if the dog performed acceptably in training, and what substances (and in what quantity) the dog has been trained and certified to detect.

4. All detection proficiency training records of the dog since initial certification, including trials designed by the dog handler and by the dog handler's supervisor(s). These allow me to assess whether the dog has continued to perform reliably, and if he/she is being maintained in a manner such that

00CR3357

18

his/her responses are reliable. In particular, these records allow me to determine if the dog's on-going training is adequate to maintain his/her reliability.

5. Current written performance standards for the dog and score sheets of all re-certification evaluations (such as from the United States Police Canine Association, North American Police Work Dog Association, National Narcotics Drug Detector Dog Association, or United States Customs or Border Patrol). This allows me to assess whether the dog is being required to meet basic performance standards to insure its reliability, and what substances (and in what quantity) it has been found to reliably detect under a variety of conditions that emulate real world conditions.

6. Departmental training evaluation for the dog handler and the dog handler's supervisor(s) (relating to the dog's detection work). This allows me to determine if the dog handler has been properly trained to train and manage the dog, and if the dog handler's supervisor is insuring that the dog is properly trained and maintained on a continuing basis.

7. All records of the dog's performance in real world searches since initial certification. This allows me to determine the dog's reliability on the job, and whether he/she is being properly handled. The assessment of these documents also determines if information gained on these searches is identified as subsequent training requirements.

8. Police reports, warrants, and laboratory reports relating to this dog. This allows me to determine the dog's reliability on the job. One important thing that these items allow me to determine is whether the dog is alerting to non-drug items, such as packaging materials, gasoline, oil, or other smells that the dog, as the result of poor maintenance, will begin to associate with drugs.

9. What is the dog's final response when it detects drugs and/or people? When one knows the defined initial response a dog is supposed to make when it detects controlled substances, it eliminates subjectivity by the handler.

10. What primary reward is used to control this dog's searching behavior? What are the different reward schedules this dog is working on when it is used to detect controlled substances both in training and real world searches? When is that reward given? This allows me to determine if the dog is being properly rewarded, thus insuring its on-going reliability.

//

11. What substances is the dog trained to detect (*e.g.*, types of drugs, currency, explosives)? This forms a basis for determining in what areas the dog is reliable.

12. Reports and records regarding the dog's performance in this case. This allows me to determine the dog's on the job performance.

13. Size and type of substance aids used in training (*i.e.*, quantity and type of drugs), how these substances were packaged, and laboratory analysis of the aids used. This allows me to determine at what level of substance a dog is reliable, and whether the dog is being properly maintained such that he/she will not respond to materials that, through poor maintenance, it may come to associate with drugs.

14. Laboratory analysis and field test results on all substances found as result of the dog's response in other cases. This allows me to determine if the dog is alerting on substances that it is actually trained to detect.

I swear that, to the best of my knowledge and memory, the foregoing is true and correct.

Dated: 4 MAR 2002

Dan J. Craig DVM
DR. DAN J. CRAIG, DVM, MS
DECLARANT

N:\MOTN\cedano.ndd.dec

# CURRICULUM VITAE

DAN J. CRAIG, BS, DVM, MS

CONSULTANT IN ANIMAL BEHAVIOR

916 Country Meadow

San Antonio, Texas 78253-5304

210-679-7804

EDUCATION: BS, Animal Science, Texas A & M 1956

DVM Texas A & M 1958

MS, Experimental Psychology, Baylor University 1970

PROFESSIONAL ORGANIZATIONS:

American Veterinary Medical Association

The American Veterinary Society of Animal Behavior

Texas Veterinary Medical Association

The Veterinary Medical Association of Bexar County

PREVIOUS POSITIONS:

1990 to present

Consultant in Animal Behavior

1974-1990

Chief, Animal Behavior Section

3280 Technical Training Group

USAF Security Police Academy

Lackland AFB, Texas

Developed and statistically analyzed training protocols to train dogs to perform military tasks ( drug detection, explosives detection and controlled aggression), conducted applied behavioral research, developed and validated dog procurement evaluation procedures, provided behavioral consultation service for military veterinarians. Developed and validated training protocols to teach dog to detect other target odors for other federal agencies ( FBI, U S Secret Service, Federal Aviation Administration, US Department of Agriculture). Wrote the principles of conditioning which were incorporated in all the dog training course outlines to teach military working dogs, instructors, and handlers to properly train their dogs to perform all required tasks. Provided technical guidance to the upgrade of the Educational Subject Block Index C1 to C15 used in the field maintenance of military working dogs and handlers by the USAF. Established objective certification standards for patrol dogs, drug detector dogs, and explosives detector dogs. Developed a validation system to determine the reliability of detector dogs that became the standard for the USAF in Air Force Regulation AFR 125-5, Military Working Dog Program. Developed and justified the establishment of a consignment process in order to predict a very high rate of trainability of dogs entering the military procurement system. Developed and justified an Interactive Video Disc System to be used in initial dog instructor and handler training and for advanced upgrade training after assignment of handlers to field units. Wrote the post-certification evaluation standards ( validation testing AFR 125-5 par 11-28) that were incorporated in the Military Working Dog Program Regulation. Supervised personnel who performed independent evaluations of all the dogs trained by the Department of Defense to determine if they met certification standards. Conducted training seminars for instructors, kennel masters, and training non-commissioned officers who were attending the MWD Supervisors Course.

1974 Jan to Oct
Research Veterinarian
Wilford Hall, USAF Medical Center
Lackland AFB, Texas

Developed a system to identify appropriate aggressive responses by dogs to predict trainability. Provided behavioral consultation service to other military veterinarians relating

to the behavior of military working dogs. Conducted training seminars for dog training instructors.

1970-1974
Wing Radiobiologist, & Deputy Branch Chief
Weapons Efffects Branch, Radiobiology Division
USAF School of Aerospace Medicine
Brooks AFB, Tx.

Principle investigator, assessed behavioral decrements in primates to ionizing and non-ionizing radiation, measured visual system effects of high Z-particles in primates, measured behavioral effects of radiation and chemically induced emesis in primates. These measurements along with other accidental exposure data were used to establish field exposure standards for field troops assigned to NATO. Evaluated the existing Military Working Dog Program Training System in use at that time. Identified and justified the need to add a formally trained experimental psychologist to the training staff.

1968-1970
Graduate Student, Experimental Psychology, Baylor University.
Thesis: Measurement of the short term effects of Cannabis sativa extract on the social behavior in baboons.

1967-1968
Research Veterinarian, Toxic Hazards Branch,
Psychology Division, 6571st Aeromedical Research Laboratory
Holloman, AFB, NM

Co-investigator, conducted behavioral decrement studies which measured the effects of rocket fuels on the visual and auditory function in primates. Performed neurosurgery on primates used in performance studies by the use of a conditioned suppression technique to determine the presence or absence of high energy x-rays. Perfomed surgical implantation procedures in primate behavioral studies used in the identification of physical or psychological dependency of drugs as a part of a Federal Drug Administration project.

1964-1967
Area Veterinarian, & Deputy Director of Veterinary Services
USAF Hospital Tachikawa Japan

Primary duties included food inspection for procurement and public health inspections of food service facilities. Provided medical and surgical care for Military Working Dogs assigned to Showa Dog Training Center. This facility was a branch of the USAF Air Training Command Facility at Lackland AFB, Tx. The handlers and dogs were being trained for service in Viet Nam.

1958-1964
Private Practice, Waco and Cisco, Texas