FILED
00 SEP -7 PM 3:04
BY: DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff-Respondent,<br>v.<br>Joseph Anthony-Haines,<br>Defendant-Petitioner. | ) | CRIMINAL NO. 00-1690-R<br><br>ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE AND PRODUCE DISCOVERY |

**I. Overview**

Defendant Joseph Anthony-Haines has filed motions to suppress evidence and produce discovery. For the reasons stated below, the Court denies both motions.

**II. Background**

At 7:10 p.m. on May 12, 2000, Defendant Joseph Anthony-Haines drove his pick-up truck into the U.S. Border Patrol checkpoint on California Highway 78. Covering the truck bed was a shell with several tinted windows on its sides and back wall. Border Patrol Agents Joshua Moore and Alfonso Jimenez (the "Agents") were on duty at the checkpoint. Once Defendant's truck stopped in the

primary inspection lane, Agents Moore and Jimenez approached the truck. While Agent Jimenez visually inspected the vehicle, Agent Moore questioned Defendant about his nationality. During his visual inspection, Agent Jimenez saw through the shell's tinted windows two large black duffel bags in the truck bed. Each bag--about four feet long and stuffed full--was large enough to contain a person. Agent Jimenez interrupted Agent Moore's conversation with Defendant and had him look at the bags. Agent Moore saw the outline of square brick shaped objects concealed in the bags; Agent Jimenez could not see the outline of the bags' contents. Packaging drugs into square blocks is a common to transport drugs according to Agent Moore.

Once Agent Moore returned to his conversation with Defendant, Defendant appeared nervous to Agent Moore, asking him "what's wrong," fidgeting with his hands, and paying attention to Agent Jimenez's continuing visual inspection of the truck. Agent Moore asked Defendant where he was going. Defendant stated that he was going from Yuma to Pomona, California, to visit his hospitalized grandfather. Defendant then stated that he was going to Pomona to transport his grandmother back to Yuma. Despite Defendant's claimed emergency, Defendant was not taking the fastest or safest route between Yuma and Pomona. At this point, Agent Moore had Defendant drive his truck into a secondary checkpoint ("secondary") for further investigation. The inspection at the primary checkpoint ("primary") lasted about two minutes.

At secondary, Defendant appeared nervous to Agent Jimenez.

His hands were shaking when he handed the truck's registration papers to Agent Jimenez. Defendant repeatedly asked the Agents if anything was wrong. When Agent Jimenez told him that they were suspicious of the duffel bags, Defendant first acted surprised as to the existence of the bags, then denied knowledge or ownership of the bags. Agent Jimenez then asked for and received Defendant's permission to search the truck. However, Defendant stated that could not give the Agents access to the truck bed because it was locked and he had no key to it. Also, Defendant withheld consent to search the bags because the bags were not his.

After receiving consent, Agent Jimenez left the truck to request a narcotics detector dog. The Border Patrol had no dog available. Agent Jimenez was instructed to call the California Highway Patrol who might have a dog. He asked for the dog because he felt he did not think he "had enough" to search.[1] When Agent Jimenez returned, he informed Defendant that he had requested a narcotics detector dog. During the next few minutes after learning of the request, Defendant stated to the Agents that his brother had gotten into trouble for carrying bags like these, that his brother was in prison, and that the bags probably contained drugs. Defendant then volunteered to crawl through a rear sliding window to find out what was in the bags despite Agent Jimenez telling him that under the Constitution he need not do so.

---

[1]Agent Jimenez's belief that he lacked sufficient information to warrant a search does not control the issue. The Court determines on an objecitve basis whether there is sufficient information to justify a search or detention. See United States v. Garza, 980 F.2d 546, 550 (9th Cir. 1992).

Defendant crawled into the truck bed, then crawled back out and told Agent Jimenez that the bags contained drugs. Later, the bags were found to contain 238 pounds of marijuana.

## III. Discussion

Defendant has filed the following motions: (1) to suppress evidence seized from the checkpoint search; (2) to produce discovery regarding the ratio of drug arrests to immigration arrests at permanent immigration checkpoints. The Court denies both motions.

### A. Denial of Motion to Suppress

In United States v. Martinez-Fuerte, the Supreme Court held that the government may stop vehicles at permanent immigration checkpoints for brief questioning of drivers and passengers without individualized suspicion. 428 U.S. 543, 562 (1976). So long as the stop is limited to a few brief questions, presentation of documents, and a "visual inspection of the vehicle . . . limited to what can be seen without a search", these stops are per se reasonable. See United States v. Taylor, 934 F.2d 218, 220 (9th Cir. 1991)(quoting Martinez-Fuerte, 428 U.S. at 558). The government may also selectively refer vehicles and occupants to secondary checkpoints without individualized suspicion. See United States v. Wilson, 7 F.3d 828, 833 (9th Cir. 1993). Such referrals are valid unless objective evidence shows the referrals to be pretext for investigation of other non-immigration crimes. See

id.

Once at the secondary inspection area, the government may briefly further investigate vehicles and occupants for immigration related offenses without individualized suspicion. See id. Detention beyond this brief time is legal if based on an articulable suspicion of criminal activity or consent of the occupants. See Taylor, 934 F.2d at 221 (holding that brief further detention "beyond time required for immigration purposes is legal if predicated on an articulable suspicion of criminal activity"). Examples of facts supporting articulable suspicion at permanent immigration checkpoints include occupants' increasing nervousness, see United States v. Preciado-Robles, 964 F.2d 882, 884 (9th Cir. 1992), occupants' erratic behavior, see Wilson, 7 F.3d at 834, and occupants' inconsistent stories, see United States v. Oba, 978 F.2d 1123, 1128 (9th Cir. 1992).

Here, Defendant makes three arguments why all evidence seized at the checkpoint should be suppressed: (1) the Agents lacked reasonable suspicion at primary to prolong Defendant's detention; (2) the Agents lacked probable cause to refer Defendant to secondary; (3) Defendant's consent to search his truck was invalid. The Court rejects each argument.

**1. Detention at Primary and Referral to Secondary**

Administrative searches at permanent immigration checkpoints should be minimally intrusive. See Taylor, 934 F.2d at 220. Agents are permitted to briefly question drivers and passengers about their citizenship. See id. Detention beyond this point

requires an articulable suspicion of criminal activity. See Wilson, 7 F.3d at 834.

Defendant argues that once the Agents determined Defendant's identity, United States citizenship, and that he was violating no immigration laws, Defendant should have been permitted to leave the checkpoint. Instead, the Agents continued to question Defendant about where he was going and why. This continued detention and investigation could not have been for immigration purposes, Defendant argues, and so was pretext for a drug search. Thus, the continued detention at primary to search for drugs required reasonable suspicion, which the Agents lacked.

The Court rejects these arguments because they lack factual support. To analyze these claims, Defendant's detention can be divided into two phases: initial detention for immigration purposes; detention after discovery of the black duffel bags.

Border patrol agents are permitted to briefly question drivers and occupants, and to visually inspect vehicles for hidden illegal aliens at permanent immigration checkpoints. See Taylor, 934 F.2d at 220. It was during this authorized visual inspection that Agent Jimenez noticed the two black duffel bags. Although Agent Jimenez could not see the outline of square bricks in the duffel bags, Agent Moore stated that he could.[2] At this point

---

[2]The Court has examined pictures taken from outside the truck shell. Although the pictures are not of the highest quality, the testimony of Agent Moore demonstrated that he saw the outline of square bricks in the duffel bags while looking through the shell's tinted windows at 7:10 p.m. Moreover, even if Agent Moore could not have seen the duffel bags at this level of detail, the fact

(and without reference to Defendant's subsequent suspicious behavior), Agent Moore had articulable suspicion that Defendant was smuggling drugs since drug smugglers often package drugs for transport in square bricks.

Thus, the further detention and questioning of Defendant as to where he was going and why was not pretext to gather evidence of other crimes as Defendant argues. Rather, the outline of the bricks provided the articulable suspicion of criminal activity necessary to justify the continued detention of Defendant at primary and the referral to secondary.

Moreover, Defendant's suspicious behavior after discovery of the duffel bags only increased the Agents' quantum of suspicion. For example, Defendant became increasingly nervous and fidgety once he realized Agent Jimenez was looking into the truck bed. See Taylor, 935 F.2d at 221 (defendant's nervousness at checkpoint constituted minimal articulable suspicion); United States v Nikzad, 739 F.2d 1431, 1432-33 (9th Cir. 1984)(defendant's nervousness and avoidance of eye contact gave rise to reasonable suspicion). Also, Defendant's route of travel was unusual. He claimed to be driving to Pomona for an emergency--to see his hospitalized grandfather--yet was not traveling the fastest or safest route. See Oba, 978 F.2d at 1128 (defendant's perceived

---

that the bags were large enough to conceal people--being four feet long and over stuffed--could be seen by the Agents. This information would support a finding of articulable suspicion of another kind of criminal activity--smuggling illegal aliens hidden inside the duffel bags--sufficient to justify the prolonged detention and referral to secondary.

inconsistent accounts are grounds for suspicion). Moreover, the reason for the trip sounded fantastic--his grandfather had a heart attack, and might need to have his leg amputated. Together with the suspicious duffel bag, Defendant's suspicious behavior supplied more than enough evidence to meet the "articulable suspicion" standard necessary to justify further detention.

**2. Detention at Secondary and Consent to Search**

Defendant next argues that his detention at secondary violated the Fourth Amendment because the Agents lacked probable cause to detain him. According to Defendant, the Agents admitted that they lacked enough information to justify a search of the truck and prolonged the detention in an effort to gather more information. This prolonged detention is tantamount to a seizure of a person requiring probable cause, which the Agents admitted they lacked. Moreover, Defendant cites Brown v. Illinois, 422 U.S. 590, 597-603 (1975), for the proposition that since his consent to the search occurred during an illegal seizure, the government must make an additional evidentiary showing to make the consent valid.[3] Since the government has made no such showing, Defendant argues that his consent to the search is invalid.

The Court rejects these arguments because they lack factual

---

[3] Brown lists three factors that must be met before consent obtained during an illegal seizure is valid: (1) the temporal proximity between the illegal conduct and the search; (2) intervening circumstances; (3) the purpose and flagrancy of the initial misconduct. 422 U.S. at 597-603. Since the Court finds that Defendant was not illegally seized by Agents Moore and Jimenez, Brown does not apply to the present case.

support. To analyze them, Defendant's detention at secondary can be divided into two phases: (a) detention before granting consent; (b) detention after granting consent.

**a. Detention Before Granting Consent**

At secondary, agents may briefly detain vehicles and occupants to investigate suspected nonimmigration criminal activity without consent. See Wilson, 7 F.3d at 834; Taylor, 934 F.2d at 220-21; Preciado-Robles, 964 F.2d at 884. Here, the detention Defendant suffered before granting consent was minimal and well within the brief further detention authorized by Taylor. Before granting consent, the Agents asked Defendant a few questions: his identification and the truck's registration; when Defendant asked if anything was wrong, the Agents told him that they were suspicious of the duffel bags. After telling Defendant this, the Agents asked for and received Defendant's consent to search the truck. Thus, until granting consent, the detention and questioning Defendant experienced was brief and involved simple requests for identification and registration. Since this detention was legal, the Defendant's consent to the search during this detention does not require suppression.

**b. Detention After Consent**

Once defendant granted his consent, the Agents were no longer obligated to keep the detention minimally intrusive. See Martinez-Fuerte, 428 U.S. at 567 (beyond limited intrusion, checkpoint searches are constitutional only if justified by consent or probable cause). Nonetheless, the only other burdens

Defendant suffered at secondary was answering more of the Agents' questions and a delay of a few minutes between granting consent and crawling into the truck bed himself. Defendant was never subjected to a search of his truck by the Agents. Rather, he searched himself by crawling into the truck bed despite being told by the Agents that he need not do so. Since Defendant's self-search occurred during a detention justified by his consent, the recovered drugs are not the result of an illegal seizure.

**B. Denial of Motion to Produce Discovery**

Defendant argues that the government has transformed permanent immigration checkpoints into a general law enforcement checkpoint. Defendant correctly states that permanent immigration checkpoints have a limited scope of operation--to investigate immigration related crimes. See United States v. Soyland, 3 F.3d 1312, 1316-18 (9th Cir. 1993)(Kozinski, J. dissenting). Since they are classified as administrative searches, the amount of intrusion they may impose on citizens is limited. Id. Defendant alleges, however, that these checkpoints are part of a "'massive violation of the Fourth Amendment'" because law enforcement officers are treating the immigration search as pretext for a general crimes search. (Def.'s Mem. Supp. Mot. Suppress at 8)(quoting Soyland, 3 F.3d at 1315). To support his claim, Defendant requests discovery from the government as to the ratio of drug arrests to immigration related arrests at permanent immigration checkpoints.

The Court rejects Defendant's request. Defendant must show that the requested discovery is "material to the preparation of [his] defense." Fed. R. Crim. P. 16(a)(1)(C); United States v Khan, 35 F.3d 426, 431 (9th Cir. 1994)(same). The issue in this case is not how immigration checkpoints are being used by law enforcement officials as a general matter. Rather, it is whether Agents Moore and Jimenez had sufficient factual support to justify *detaining Defendant at primary, referring him to secondary, and* then detaining him at secondary. As discussed above, the Court finds that they did.

**IV. Conclusion**

For the reasons stated above, Petitioner's Motion to Suppress Evidence and Produce Discovery is denied.

IT IS SO ORDERED:

Date: 9/8/2008

John S. Rhoades, Sr.
United States District Judge

Copies to:

All Parties